Louise MEDINA, as Personal Representative of Marcos Ramirez, Deceased, Plaintiff,

v.

STATE of Oklahoma, Dr. Municief, and Marcus Progue, in their Individual and Official Capacities, Defendants.

No. 79347.

Supreme Court of Oklahoma.

Sept. 28, 1993.

Rehearing Denied March 22, 1994.

Mark Hammons, Hammons, Taylor & Associates, Oklahoma City, for plaintiff.

Susan B. Loving, Atty. Gen., Robert M. Anthony, Asst. Atty. Gen., Oklahoma City, for defendants.

ALMA WILSON, Justice:

Pursuant to the Uniform Certification of Questions of Law Act, 20 O.S.1991, §§ 1601 et seq., the United States District Court for the Western District of Oklahoma certified the following question of state law to this Court:

Does the dispensing of medicine to an inmate in a state penal institution by a state employee come within the exception provided by Okla.Stat. tit. 51, § 155(23) (Supp. 1989)?

The certified question of law arises out of allegations that the death of Marcos Ramirez, an inmate at the Mack H. Alford Correctional Center of the State of Oklahoma, was caused by the wrongful acts of the officers and employees of the State of Oklahoma in dispensing lethal amounts of prescription medication to Ramirez' cellmate. We answer that the dispensing of medicine to an inmate in a state penal institution by a state employee is a function performed in the operation of the institution and exempt from tort liability under 51 O.S.Supp.1989, § 155(23).

The plaintiff, Louise Medina, personal representative of Marcos Ramirez, deceased, filed suit in the state district court against the State of Oklahoma ex rel. the Department of Corrections and its officers and employees. Upon motion of the State, the suit was removed to the federal district court. The amended pleadings before the federal district court frame three separate claims: 1) Ordinary negligence in the dispensing of prescription medication against the State of Oklahoma under the Governmental Tort Claims Act, 51 O.S.Supp.1989, §§ 151, et seq. (GTCA); 2) Gross negligence in the dispensing of prescription medication and in the failure to implement the suicide awareness plan against the officers and employees of the State of Oklahoma in their individual capacity; and, 3) Civil rights violations against the individual defendants in their personal capacity. The certified question relates to the ordinary negligence claim against the State under the GTCA.[1]

The federal district court provided the following facts as relevant to the question certified. The decedent, Marcos Ramirez, was celled with inmate Grant at the Mack H. Alford Correctional Center. The prison physician prescribed Enkaide for inmate Grant's congenital heart condition to be taken every six hours. Grant had been taking the same drug in the same manner since childhood. Once each week the prison pharmacy dispensed a supply of twenty-eight tablets of Enkaide to inmate Grant. The prison pharmacy dispensed all prescription medication in the same manner at weekly "pill lines."[2] A one-week supply of Enkaide, twenty-eight pills, is a potentially lethal quantity of such

1. The federal court denied defendants' motion to dismiss the negligence claims as exempt under the GTCA, concluding that the alleged gross negligence of the employees could not fall within the scope of employment and hence is not within the ambit of the GTCA pursuant to 51 O.S.Supp. 1989, § 152(9), defining "scope of employment" to mean performance by an employee acting in good faith within the duties and tasks lawfully assigned; and, 51 O.S.Supp.1989, § 153, declaring that the state shall be liable for loss resulting from the torts of its employees acting within their scope of employment. The defendants then moved for summary judgment on all claims, whereupon the U.S. Magistrate certified the state

law question as to the state's liability for the ordinary negligence of its personnel.

2. The certification order advises that there are factual disputes as to whether the weekly "pill line" custom is a violation of the written procedure for dispensing medicine; whether an institutional physician authorized the dispensing of prescription medications in multiple doses; and whether any individual judgment was made regarding the hazards of allowing the Enkaide to be dispensed to inmate Grant in multiple doses. These factual disputes do not preclude our determination of the scope of the exemption from tort liability in 51 O.S.Supp.1989, § 155(23).

medication. The written procedure of the Department of Corrections, effective June 14, 1990, provided that prescription medicines shall be dispensed in unit doses, but selected pharmaceuticals may be dispensed in multiple doses if approved in writing by the physician.[3] On September 15, 1990, Marcos Ramirez died from ingesting a lethal amount of Enkaide, either by his intent or accidentally.

The personal representative of Marcos Ramirez, deceased, contends that 51 O.S.Supp. 1989, § 155(23) must be narrowly construed and it's scope must be limited to discretionary, policy making decisions, citing *Nguyen v. State,* 788 P.2d 962 (Okla.1990). The State counters that § 155(23) clearly includes the infinite number of activities that are involved in the day-to-day operation of a prison.

To interpret any statute, we begin with the plain language of the statute. Title 51 O.S. 1991, § 155(23)[4] provides:

The state or a political subdivision shall not be liable if a loss or claim results from:

23. **Provision, equipping, operation or maintenance of any prison, jail or correctional facility,** or injuries resulting from the parole or escape of a prisoner by a prisoner to any other prisoner; provided, however, this provision shall not apply to claims from individuals not in the custody of the Department of Corrections based on accidents involving motor vehicles owned or operated by the Department of Corrections;

[Emphasis added.]

■ The meaning of the words "provision," "equipping," "operation" and "maintenance" is at issue. Assigning the ordinary meanings to those words, § 155(23) protects the state from liability for loss resulting from the actual stock of (provision) or the supplying of (equipping) all that is necessary to the functioning of a penal institution, or the process or manner of conducting (operation) the functions of a penal institution, or the process or series of acts necessary to sustaining (maintenance) the proper conditions of a penal institution.[5] The plain and ordinary meanings of the terms of § 155(23) are the broad meanings urged by the defendant State and must be followed unless contrary to the purpose and intent of the statute.[6]

■ The purpose and intent of the exemption in § 155(23) must be gleaned from

---

**3.** The Policy and Operations Manual, Health Services, Pharmacy Operations, OP 140130, provides in part:

G. *Administration of Pharmaceuticals*
2. All prescription medications shall be dispensed in unit dose at appropriate intervals. With written approval of the institutional physician, selected pharmaceuticals may be dispensed in multiple doses. Inmates in restricted housing units shall not have medication in their possession unless approved by the institutional physician and facility head or designee.

**4.** The provisions of 51 O.S.Supp.1989, § 155(23) remain unchanged in the 1991 recodification.

**5.** The ordinary meaning which we have assigned to the words "provision," "equipping," "operation" and "maintenance" are the common definitions found in *Webster's New International Dictionary,* Second Edition, Unabridged, 1961, G. & C. Merriam Company, Springfield, MA; *The Random House Dictionary of the English Language,* Second Edition, Unabridged, 1987, Random House, NY; *Funk & Wagnalls New Comprehensive International Dictionary of the English Language,* Deluxe Reference Edition, 1982, Publishers International Press, Newark, NJ; *The Ox-*

*ford English Dictionary,* Second Edition, 1989, Carendon Press, Oxford, England; and, *The American Heritage Dictionary,* Second College Edition, 1985, Houghton Mifflin Company, Boston, MA.

**6.** In the absence of statutory definitions, this rule of statutory construction is elementary. Our recent pronouncements of this rule include: *Oglesby v. Liberty Mutual Insurance Company,* 832 P.2d 834 (Okla.1992) (Unambiguous statutory language must be followed without further judicial inquiry except where contrary intention plainly appears.); *TWR/Reda Pump v. Brewington,* 829 P.2d 15 (Okla.1992) (A statute will be accorded the meaning expressed by the language used, if the language is plain and unambiguous and its meaning is clear and no occasion exists for application of rules of construction.); *Berry v. State ex rel. Oklahoma Public Employees Retirement System,* 768 P.2d 898 (Okla.1989) (Ordinary meaning of the terms of a statute are controlling absent an irrational result.); and, *Matter of Income Tax Protest of Ashland Exploration, Inc.,* 751 P.2d 1070 (Okla.1988) (Words used in a statute must be given their ordinary and common definitions unless contrary intention is plain or the context dictates a special or technical meaning.).

the statute as a whole.[7] Plaintiff contends that the purpose and intent of § 155(23) is to protect the government from liability for discretionary, policy-making actions of its prison personnel. However, that exemption is specifically and separately provided in subsection 5 of § 155.[8] Plaintiff also contends that any broad meaning assigned to the terms of subsection 23 must be limited by subsection 28, arguing there is no rational governmental purpose justifying sovereign immunity for employees who fail to abide by institutional policies. However, subsection 4 of § 155 expressly exempts failures to enforce institutional policies.[9] The exemptions in subsections 4 and 5 of § 155 apply to all governmental entities, including penal institutions, while the exemption in subsection 23 applies only to penal institutions. The obvious purpose and intent of § 155 is to shield the state from tort liability for the enumerated activities of state officers and employees. And, the obvious purpose and intent of subsection 23 is to provide immunity in addition to the immunity provided in subsections 4 and 5. The plain and ordinary meanings of the terms of subsection 23 accomplish the obvious purpose and avoid redundancy.[10] Accordingly, we reject plaintiff's discretionary function argument. Section 155(23) must be read as an operational function exemption.

For purposes of the GTCA, operational functions include all activity involved in the performance of policy, while discretionary functions are limited to policy-making or planning level actions or decisions. The scope of the discretionary function exemption of the GTCA, § 155(5), is tested by the planning-operational standard.[11] Under the planning-operational approach, the discretionary function exemption would include policy-making or planning level activities, while the operational function exemption at issue would include activities of a penal institution, such as the dispensing of prescription medications. Considering all the exemptions enumerated in § 155, it is obvious that the purpose and intent of § 155(23) is to protect the state and political subdivisions from tort liability for loss resulting from the functions of the officers and employees performed in the operation of a penal institution.

7. *Naylor v. Petuskey*, 834 P.2d 439 (Okla.1992).

8. Title 51 O.S.Supp.1989, § 155(5) provides:
The state or a political subdivision shall not be liable if a loss or claim results from:
5. Performance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees;
*Nguyen v. State*, 788 P.2d 962 (Okla.1990), limits this exemption for discretionary actions to policy-making actions. See, note 12, infra.

9. Title 51 O.S.Supp.1989, § 155(4) and (28) provide:
The state or a political subdivision shall not be liable if a loss or claim results from:
4. Adoption or enforcement of or failure to adopt or enforce a law, whether valid or invalid, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy;
28. Acts or omissions done in conformance with then current recognized standards;
By enacting both these exemptions, the Legislature expressed its intent that current recognized standards and written policy of a governmental agency are not synonymous. The current-recognized-standards exemption in subsection 28 has been read to mean the standard of care required of a psychiatrist based upon knowledge, skill, care and diligence that is possessed and exercised by other persons in the same field of endeavor in the same or similar locality at the same time. *Nguyen v. State*, 788 P.2d 962 (Okla.1990).

10. Where possible, a statute must be read to render every part operative, *State ex rel. Thompson v. Ekberg*, 613 P.2d 466 (Okla.1980), and to avoid rendering it superfluous, *Anderson v. O'Donoghue*, 677 P.2d 648 (Okla.1983), or useless, *Board of Education of Oklahoma City v. Woodworth*, 89 Okl. 192, 214 P. 1077 (1923).

11. *Nguyen v. State*, 788 P.2d at 964, wherein we said that the discretionary function exemption is extremely limited, otherwise the government's waiver of sovereign immunity would be eradicated. In holding that the release of a patient from a mental health institution is not a discretionary, policy-making action and exempt from liability, we recognized the planning-operational majority approach under the tort claims laws of other states and the federal government. We adhered to the planning-operational approach in *Walker v. City of Moore*, 837 P.2d 876 (Okla.1992), concluding that the decision to use road signs or pavement markings to regulate traffic is a planning function, while the maintenance of a roadway is an operational function.

██ Plaintiff also contends that any broad meaning of the terms used in the first clause of § 155(23) is limited by the second and third clauses. The second clause, exempting injury resulting from escape or parole, cannot be read as a limitation of the first clause.[12] However, the third clause, providing that the state may be liable for injury to individuals not in the custody of the Department of Corrections caused by an accident involving a motor vehicle owned or operated by the Department, expresses an intent to limit the operational function exemption to permit claims for loss resulting from the use of motor vehicles in the operation of a penal institution. The third clause would be unnecessary verbiage if the purpose of the first clause were limited to planning level or policy-making actions.[13]

██ We conclude that the purpose and intent of § 155(23) is to preserve sovereign immunity against claims of loss resulting from operational level actions by state officers or employees at a penal institution. Accordingly, we hold that the dispensing of medicine to an inmate in a state penal institution by a state employee is a function performed in the operation of the institution and exempt from tort liability under 51 O.S.Supp.1989, § 155(23), now codified at 51 O.S.1991, § 155(23).

Because we determine that the exemption in § 155(23) protects the state and its political subdivisions from liability for loss resulting from the myriad of actions by the officers and employees of a penal institution at the operational level, we consider plaintiff's due process and equal protection argument. This argument involves failure to implement a suicide awareness plan as well as failure to dispense the Enkaide in unit doses. Additional material facts were provided in the event this Court should determine that the status of Ramirez as an alleged suicide risk is relevant. It is the apparent basis of plaintiff's constitutional argument.

The prison had a tri-level suicide awareness policy, but it was not implemented as to Ramirez.[14] Several weeks prior to his death, Ramirez had threatened suicide, although la-

12. The purpose and intent of a statutory provision cannot be defeated by the rule of statutory construction that the mention of one thing implies the exclusion of another. *State ex rel. Macy v. Freeman*, 814 P.2d 147 (Okla.1991).

13. Reading the three clauses of § 155(23) together reveals an intent to withhold the waiver of sovereign immunity for any loss or injury, whether to an inmate or other person, resulting from the operational level acts required to furnish the services of a penal institution, including the construction and repair of the facility; the security of the facility; the employment of personnel; the utilities and furnishings of the facility; the food, clothing, items for hygiene and other basic personal items needed by inmates or other persons; the educational, rehabilitative, communicational, recreational and medical and health services or any other service provided for inmates or other persons; the assignment of an inmate to a facility or a cell; and the release of an inmate; with the single exception of loss to persons not in custody caused by an accident involving a motor vehicle operated by the Department of Corrections.

14. Ramirez's suicide risk status is disputed. The prison file contained entries noting Ramirez had suffered self-inflicted harm and his reaction to disappointment was adverse. The plaintiff contends that the entries establish a known risk of suicide, while defendants argue that the entries merely demonstrate attention-getting behavior. According to defendants, Ramirez was not an active suicide risk at the time of his death and he had been recognized as a suicide risk only because of attention-getting self-destructive behavior and statements about suicide made during his years in custody, but that Ramirez was not an active suicide risk so as to warrant implementation of the written suicide awareness policy. The written policy provides, in part:

A. *Suicide Risk:*
1. The "Suicide risk" status shall represent three levels of risk with three types of response by staff:
  a. "Self-destructive risk awareness" status will occur if the subject:
    1. has a history of self-injury potential, in similar circumstances and current adjustment is unknown or marginal, or,
    2. evidences mild/few self-injury indications and no immediate danger is reported or observed. Current adjustment is unknown or marginal.
  b. "Self-destructive risk watch" status will occur if the offender evidences several significant indicators for self-destructive behavior but immediate danger is not reported or observed.
  c. "Self-destructive risk precautions" status shall occur if the offender evidences an immediate physical danger to himself through self report and/or observations.

ter that day Ramirez claimed he made the threat to get attention. Shortly before his death, Ramirez had been denied parole. During the prison's investigation of the death of Ramirez, a number of Enkaide tablets were found in the cell and a misconduct report for contraband was issued to inmate Grant for having an unauthorized number of medication. In response to interrogation, inmate Grant said that he noticed inmate Ramirez was 'high' on something; that inmate Ramirez told him he had taken five Enkaide tablets; that ten to thirty of his Enkaide tablets were missing from his supply in his cell;[15] and that inmate Ramirez had made statements indicating a suicide attempt.

■■■■ Plaintiff asserts that due process and equal protection require a civil remedy be available to a prisoner who suffers injury, in this case death, allegedly caused by the failure of the personnel of the Department of Corrections to follow their regulations for dispensing prescription medication and implementing suicide watch. If plaintiff claims procedural due process, we are cognizant that a regulation may create a procedural due process right.[16] We do not discern the creation of an interest implicating procedural due process in the involved regulation and policy. If plaintiff claims substantive due process, the Due Process Clause of the Fourteenth Amendment affords no greater protection to an inmate than does the Cruel and Unusual Punishment Clause of the Eighth Amendment.[17]

■■■■ The Eighth Amendment is the primary source of substantive rights of a prisoner.[18] Every governmental action affecting the well-being of a prisoner is not subject to Eighth Amendment scrutiny, only the unnecessary and wanton infliction of pain.[19] Mere negligence and ordinary errors of judgment do not make out an Eighth Amendment claim.[20] Wanton conduct and deliberate indifference to serious medical needs by prison officers or employees trigger the Cruel and Unusual Punishment Clause of the Eighth Amendment.[21] The certified question relating to allegations of ordinary negligence by the State of Oklahoma does not require Eighth Amendment and Fourteenth Amendment inquiry.

■■■■ Further, we recognize that prisoners are protected from invidious discrimination under the Equal Protection Clause of the Fourteenth Amendment,[22] but again, we do not find an equal protection claim in the instant matter. The plaintiff cites no authority to support the constitutional claims pre-

15. At the time of Ramirez' death, the prescription for Enkaide to inmate Grant had expired and the medication was being continued by the oral directive of a non-physician medical administrator. Defendants allege that Enkaide was dispensed to inmate Grant even though the physician's prescription had expired because the medication was life sustaining and no physician was available.

16. The Fourteenth Amendment Due Process Clause does not require a hearing in every conceivable case of government impairment of private interest. *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). State created right to good time credits is liberty interest which a prisoner is entitled to minimum requirements of procedural due process to be deprived of that interest, *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); but, prisoner is not entitled to procedural due process to be denied discretionary parole authorized by statute, *Greenholtz*

*v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

17. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

18. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); and, *Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir.1990).

19. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

20. *Whitley*, 475 U.S. at 318, 106 S.Ct. at 1083.

21. *Helling v. McKinney*, —— U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

22. The Equal Protection Clause protects prisoners from invidious discrimination based on race. *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

sented and we find no reported authority holding that the Eighth Amendment or the Fourteenth Amendment requires the state to waive its sovereign immunity and provide an inmate with a remedy under its governmental tort claims statutes for the ordinary negligence of officers or employees at a penal institution.

**CERTIFIED QUESTION ANSWERED.**

HODGES, C.J., and LAVENDER, V.C.J., and OPALA, SUMMERS and WATT, JJ., concur.

SIMMS, J., concurs in judgment.

KAUGER, J., concurs in result.